Stephen D. Susman
590 Madison Avenue
8th Floor
New York, New York 10022-8521
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

OF COUNSEL:
Stuart V. Kusin
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Jason P. Fulton
SUSMAN GODFREY L.L.P.
901 Main Street, Suite 5100
Dallas, Texas 75202-3775
Telephone: (214) 754-1900
Facsimile: (214) 754-1933

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DOUGLAS GILSTRAP, BRIAN DILLON and JOHN MADIGAN<br>  Plaintiffs,<br><br>vs.<br><br>RADIANZ LTD. and RADIANZ AMERICAS, INC.<br>  Defendants. | § § § § § § § § § § § | Civil Action No. 1:06-cv-14218-UA<br><br><br><br>**COMPLAINT** |

Plaintiffs Doug Gilstrap ("Gilstrap"), Brian Dillon ("Dillon") and John Madigan ("Madigan") collectively ("Plaintiffs"), allege as follows:

721603v1/07658-008904

## INTRODUCTION

1.  This suit involves a claim for breach of contract by three American citizens that were induced to come to work for defendants, Radianz Ltd., a company incorporated in England but with its principal place of business in New York, and Radianz Americas Inc.[1], the U.S. subsidiary of Radianz Ltd. (collectively "Radianz"), through the offer of stock options. The offer was for options in Radianz Ltd. to receive class C shares in Radianz as part of their compensation packages.[2] Radianz Ltd. granted options to employees of Radianz Americas at the direction and control of and as the agent for Radianz Americas.

2.  The breach at issue is the failure of Radianz to pay Plaintiffs the full per share price paid for Radianz in April 2005 as required by the Radianz Ltd. Stock Option Plan ("Plan") as amended in March 2005 (the "Amended Plan"). The Plan governed the rights of Plaintiffs to exercise their options. The Plan does not contain a choice of law provision.

3.  The offers of Options to Plaintiffs were made in New York and accepted by Plaintiffs in New York. Gilstrap and Dillon worked for Radianz Ltd. and Radianz Americas at Radianz global headquarters in New York and received their paychecks from Radianz Americas. Madigan worked for Radianz Americas out of Chicago and received his paycheck from Radianz Americas in New York. Gilstrap had an employment agreement directly with Radianz Ltd., although he was president and CEO of both Radianz Ltd. and Radianz Americas. Dillon and Madigan had their employment agreements directly with Radianz Americas.

---

[1] Radianz Americas was formerly known as Radianz U.S. Inc. All references to Radianz Americas are intended to include Radianz U.S. Inc.

[2] The options were used as an inducement for Gilstrap to move from his home in Atlanta, Georgia to work at Radianz global headquarters in New York. Gilstrap was offered approximately 5% of the company's stock.

4.   Radianz breached the Amended Plan by Radianz Americas paying to Plaintiffs $0.10 for each option rather than a payment based on the over $5.51 per share actually paid. Radianz Americas made the $0.10 per option payment to Gilstrap by wire to his Houston, Texas checking account[3], to Madigan without notice by direct deposit with his monthly salary[4], and to Dillon by U.S. mail[5].

5.   Plaintiffs Gilstrap, Dillon and Madigan allege, among other things that:

- Radianz was acquired by British Telecommunications plc ("BT") from various Reuters entities ("Reuters") in April 2005. At the same time BT acquired Radianz, BT and Reuters entered into a Network Services Agreement ("Services Agreement") under which BT contracted to continue to provide the same extranet services Radianz was then providing to Reuters using Radianz network, assets and staff.

- Reuters was dependent on Radianz to service it's clients and BT could not enter into the Service Agreement on the agreed terms without acquiring Radianz to provide the services to Reuters.

- The consideration paid by BT for Radianz exceeded $1 billion. In addition to the $175 million stated purchase price in the Share Purchase Agreement, BT used Radianz to shift $890 million in cost savings in the Service Agreement not available in an arms length transaction to Reuters. $230 million in consideration was also paid to Reuters in migration funding, and other nonmonetary consideration.

- The total consideration paid for Radianz exceeded by more than 10¢ the $2.00 per share average price of outstanding options.

---

[3] Gilstrap returned the net payment he received to Radianz in order to protect his rights after Radianz refused to tell him whether acceptance would waive his claims. Radianz deposited the check and retained the returned funds but still submitted a form 1099 to the I.R.S. Although Gilstrap has not accepted the payment, he was still taxed for this amount.

[4] Madigan was not given an opportunity to accept or reject the payment. Radianz used the same tactic with virtually all option holders who were employed by Radianz at the time.

[5] Dillon has not cashed his check but Radianz still submitted a form 1099 to the I.R.S. While Dillon has not accepted the payment, he was still taxed for this amount.

6.   The total consideration actually paid by BT to Reuters for Radianz was between $1.25 billion and $1.62 billion, which was consistent with BT's own internal valuations of Radianz at the time of the sale. This amounts to a per C share equivalent value of between $5.51 and $7.24, far exceeding the $2.00 per share average price of outstanding options. The result is that Radianz breached its obligations to Plaintiffs under the Amended Plan because the per share price paid exceeded the exercise price.

7.   Plaintiffs assert claims of breach of contract of the Plan and Amended Plan, and breach of good faith and fair dealing of the Plan and Amended Plan against both Radianz Ltd. and Radianz Americas. Defendants are liable for damages sustained by Gilstrap, Dillon and Madigan as a result of defendants' actions in excess of $20 million.

## JURISDICTION AND VENUE

8.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

9.   Venue is proper in this district because the options at issue were granted by Radianz at its New York global headquarters to Gilstrap, Dillon and Madigan in this district, some or all of the breaches of contract and wrongful acts for which relief is sought occurred in this district, and/or some defendants reside or maintain their primary place of business in this district.

10.   Foreign national Radianz Ltd. has contacts in the United States and this district, has its worldwide headquarters based in New York, employs U.S citizens in and conducts business in the United States and conducted business in the district and committed all or part of the acts complained of in this district. There are no special interests of England that prohibit suit in this court.

## PARTIES

### Plaintiff

11. Plaintiff Gilstrap currently is a resident of Houston, Texas, worked for Radianz at its global headquarters in New York, and is a participant in the Plan and continues to hold Radianz stock options.

12. Plaintiff Dillon currently is a resident of Charlotte, North Carolina, worked for Radianz at its global headquarters in New York, and is a participant in the Plan and continues to hold Radianz stock options.

13. Plaintiff Madigan is currently a resident of Lisle, Illinois, worked for Radianz and reported to Radianz global headquarters in New York, and is a participant in the Plan.

### Defendants

14. Defendant Radianz Ltd. is a company incorporated in England with its principal place of business in New York and can be served through any officer of Radianz Ltd. at its New York headquarters, 575 Lexington Avenue, New York, New York 10022. Alternatively, Radianz Ltd.'s registered office is 66 Prescot Street, Kingsfield House, London E1-IHG, United Kingdom and can be served by serving England's Central Authority as established pursuant to the Hague Convention of the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, at the following address: Senior Master of the Supreme Court, Queen's Bench Division, Royal Courts of Justice, Strand London WC2A 2LL, England, U.K.

15. Defendant Radianz Americas, Inc. is a Delaware Corporation with its principal place of business in New York and can be served through its registered agent, The Corporation Trust Company, Corporate Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## BACKGROUND

16. Plaintiff Doug Gilstrap is a principal founder, and the former President and CEO, of Radianz. He joined Radianz in January 2000 and stayed at Radianz until August of 2003 as an employee of both Radianz Ltd. and Radianz Americas, and until May 2004 as a consultant with Radianz Americas. Gilstrap worked for Radianz at its global headquarters in New York. During his employment with Radianz, Gilstrap, like hundreds of other employees, received stock options from Radianz Ltd. as part of his compensation package. There are an estimated 26 million vested options outstanding with an average exercise price of approximately $2.00/share. At the time of his departure Gilstrap had over six million vested options with an average exercise price of approximately $2.00/share. Gilstrap was offered his options by both Radianz Ltd. and Radianz Americas and accepted them in New York.

17. Plaintiff Brian Dillon is the former Vice President and Head of Global Human Resources for Radianz. Dillon joined Radianz in 2000 and was employed by Radianz Americas until 2003 at Radianz global headquarters in New York. Dillon had over one hundred thousand vested options with an average exercise price of approximately $2.00/share. Dillon was offered his options in Radianz Ltd. by Radianz Americas and accepted them in New York.

18. Plaintiff John Madigan is the former Head of North American sales for Radianz. Madigan joined Radianz in 2000 and was employed prior to the sale by Radianz Americas and subsequent to the sale by BT Radianz until 2005. Madigan worked for Radianz out of Chicago and reported to Radianz in New York. Madigan had over 40,000 vested options with an average exercise price of approximately $2.00/share. Madigan was offered his options in Radianz Ltd. by Radianz Americas and accepted them in New York.

**The Creation of Radianz and the Option Plan**

19. Radianz is a telecommunications company providing extranet (private internet protocol) services to the financial community including Reuters. Radianz was officially formed in May 2000. Radianz was to manage Reuters' global network needs and delivery of financial data to its clients and on May 22, 2000 signed a 5-year agreement to that effect with Reuters. Over the next 5 years Radianz designed and built a modern internet protocol network infrastructure to service both the financial markets as well as Reuters and its clients. In order to best serve Reuters and its clients, Radianz's global headquarters were established in and remain today in New York City.

20. At the time of its creation in 2000, one of the most common and most preferred methods of employee compensation in technology companies was stock options. Radianz was no exception and used stock options with great success to recruit employees to its service. The ownership of Radianz determined to apportion 15% of the value of Radianz to shares that would be reserved for the employees through stock options. When Radianz recruited employees such as Plaintiffs, the most significant means of enticing these employees to move their families to work in New York and leave stable, well paying jobs and join a startup company was the offer of stock options as compensation. Without these options as an incentive, Radianz would have had a much more difficult time recruiting.

21. Radianz created the Option Plan in consultation with Mercer Consulting in New York in order to design a plan that would compete with the option plans offered by similar companies. Radianz Ltd. and Radianz Americas used the offer of options in Radianz to attract over 390 American citizens such as Gilstrap, Dillon and Madigan to work for Radianz in New York and elsewhere in America, even though the options were in the United Kingdom holding

company. Almost 80% of all options awarded were to U.S citizens. Gilstrap received over 20% of all options awarded.

22.     All options offered by Radianz Ltd. and/or Radianz Americas to employees were granted to employees under the Plan. Radianz Ltd. offered the Plan on behalf of itself, and as the agent for Radianz Americas. When Radianz Americas offered options to an employee as an inducement to work for Radianz in the United States, Radianz Americas then directed Radianz Ltd., as its agent, to issue options to Radianz Americas employees pursuant to the Plan. All directions to Radianz Ltd. for approval of option grants to Radianz Americas' employees came from Radianz Americas. Radianz Americas controlled whether Radianz Ltd. offered the Plan to Radianz Americas employees. Radianz Americas controlled the timing and amount of shares granted to its employees and gave Radianz Ltd. full authority to act on its behalf and offer the Plan for Radianz Americas benefit. Radianz Americas retained oversight of the quarterly pricing of options by Houlihan Lokey. The administration of the Plan was handled by a third party, Mourant & Co., and overseen by Radianz Americas.

**The Dependence on Radianz by Reuters**

23.     From June 2000 to the present, all of the assets, staff and supporting contracts to service Reuters and other clients in approximately 20 countries were owned and managed by Radianz from its New York headquarters. Radianz operates for Reuters both an older "legacy network" and a Radianz built and owned IP network that only it can provide to Reuters. Reuters is dependent on the Radianz network and Reuters clients using the Radianz network account for 90% of Reuters total revenue. Reuters cannot deliver its data to clients without using the newly designed and built global Radianz network because Radianz owns the circuits in the very office of Reuters customers. Importantly, it would take a minimum of 3-5 years for Reuters or anyone

else to build a high performance global data network to replace Radianz and then move the Reuters' clients to another provider. Reuters and Radianz are inextricably linked. No company, in the short term or mid term, could replace the services and assets provided by Radianz without bringing to a standstill Reuters data delivery to clients.

**Value of Radianz in 2004**

24. In January 2004, Houlihan Lokey Investment Bank valued Radianz in excess of $560 million (or $429 million with a 25% market liquidity discount) based on the original services contract with Reuters set to expire in July 2005. Further Radianz management issued options to option holders in June 2004 based on the $429 million value at $1.82 per share. In October 2004, Radianz management prepared a report that showed that because of Radianz improved financial performance in 2004, Radianz had created an additional $300 million in shareholder value.

**Reuters and BT Split the Consideration.**

25. In spring of 2004, Reuters decided to sell its interest in Radianz. To effectuate the sale, Radianz was put up for sale by auction. A third party, ABN AMRO, was hired by Reuters to assist the auction process by conducting valuations and setting bidding requirements. The entire process, including the valuations and the auction process itself, were based on the premise that Radianz would almost immediately begin providing substantially reduced services to Reuters because of the cancellation of Reuters' service contract with Radianz. This premise was false[6] and resulted in artificially low valuations.[7]

---

[6] As proof, almost 2 years since the decision to accept BT's bid, Radianz continues to provide an increasing volume of services to Reuters using the same Radianz networks, assets and staff. The only difference is that Radianz is operating under the BT ownership and name and charging significantly reduced pricing in order to transfer Radianz value to Reuters. The new Radianz name is BT Radianz.

26. Reuters only allowed two bidders, Equant – its money deprived 49% joint venture partner in Radianz – and BT to make offers for Radianz and the service agreement. Two U.S. based entities, Carlyle and Goldman Sachs, inquired about the purchase of Radianz and put in overtures/offers to Radianz but were not given an opportunity by Reuters to enter the auction. Equant and its owner FT had financial difficulties and were not real buyers because of their debt problems.

27. BT outbid Equant for the linked transaction with Reuters for Radianz and the service contract.

28. In September 2004, Reuters accepted the bid from BT. BT and Reuters represented to third parties, including Radianz employees, that the purchase price for Radianz was $175 million. In fact, Tom Glocer, Reuters CEO, met with Gilstrap in New York and specifically represented to him that $175 million was the purchase price paid by BT and used the same false premise given ABN AMRO that the value of Radianz was diminished because Reuters was immediately moving their business to the BT network. To the contrary, Reuters business with Radianz was increasing and the value of Radianz was not diminished. The value was increased far beyond the $429 million value relied on by the Radianz board months earlier in issuing options.

29. $175 million did not represent the full consideration Reuters received from the sale of Radianz and therefore was not properly used as the per share price in determining what to pay option holders. In addition to the $175 million, BT used Radianz to shift additional consideration in the form of $890 million in discounted network services to Reuters. $230

---

[7] In fact, in June 2004, during the same time period ABN AMRO valued Radianz at $175 million, Radianz awarded employees options at $1.82 per share, consistent with Houlihan Lokey's January 2004 Radianz valuation of $429 million (which included a 25% liquidity discount)

million in consideration was also paid to Reuters in migration costs, and other nonmonetary consideration.

30. BT is transferring to Reuters the $890 million represented in discounted network services by having Radianz charge Reuters at below market rates not available in an arms length transaction. The $230 million represented in migration funding from BT to Reuters would also otherwise be borne by Reuters in an arms length transaction.

31. Because of the nature of the dependence of Reuters on Radianz, BT could only provide the cost savings and migration funding through a successful acquisition of Radianz. BT could not provide these services without the assets, staff and contracts owned by Radianz which services and supports the global customer base of Reuters. As a result, BT conditioned the Service Agreement to its successful acquisition of Radianz. Reuters is not moving immediately to the BT network and remains on the Radianz network today.

**The per Share Price exceeds $2.00 per Share**

32. The total consideration received by Reuters from BT for the sale of Radianz is between $1.25 billion and $1.62 billion. This amounts to a per C share equivalent value of between $5.51 and $7.24. Gilstrap's, Dillon's and Madigan's options have an average strike price of approximately $2.00 per share. Accordingly, Plaintiffs have been damaged between $3.51 and $5.24 per vested option.

**The Plan**

33. Since June 2000, the Plan offered by Radianz Ltd. and Radianz Americas to their employees governed the rights of option holders like Plaintiffs. A true and correct copy of the June 2000 Option Plan is attached hereto as Exhibit A. The Board of Directors of Radianz Ltd. controls the Plan for itself and Radianz Americas and under the Plan has the power to amend it, but the Plan prohibits the Board from amending the Plan in a manner that "would materially prejudice the interest of Option Holders." *See* § 8.31 of the Plan.

34. A sale of Radianz triggers two alternative provisions. First, under Section 5.2.1 option holders can exercise their options upon a third party acquiring 100% Control of the company. Control is defined as "100% of the ordinary share capital of the Company." And under the Articles of Association, ordinary share capital is defined as all three classes of stock, A class, B class, and C class. Under this provision, if the purchaser contracted to buy 100% of the ordinary share capital of Radianz, the purchaser would buy the newly exercised C shares from the option holders.

35. In the alternative, under Section 5.6, the Board of Radianz can instead require option holders to release their Subsisting Options, in consideration of the grant of a New Option in the Acquiring Company. The New Option must have a Market Value equal to the aggregate Market Value of the released Shares of Radianz and the "market value" must be determined by an independent third party.

36. Initially, Reuters responded in October 2004 to the planned sale of Radianz with a plan to obtain a third party valuation. Ed Banks, the Head of Commercial Finance and Planning at Radianz in New York, was the liaison between Radianz and Reuters. In December 2004, the Radianz board, controlled by Reuters, agreed to hire Houlihan Lokey to value Radianz. Houlihan

Lokey had valued options for Radianz management in New York since the inception of Radianz in 2000. Banks became the Radianz liaison with Houlihan Lokey as he had been since he joined the company.

37. On January 21, 2005, consistent with its directive from the Radianz Board to value Radianz at the time of the sale, Houlihan Lokey proposed a valuation methodology reflecting the inter-relationship between Radianz and the services contract with BT. The proposed methodology ascribed value to Radianz options based on the costs savings and other consideration paid for Radianz in the linked transaction. Based on the terms of the sale, that methodology would have placed the value of Radianz in excess of $2.00 per share and put employee options in the money. Reuters rejected this methodology and insisted Houlihan Lokey only consider the BT purchase price in establishing a value. When Houlihan Lokey resisted, Reuters, which controlled the Radianz board, terminated the board approved valuation.

38. The purchase was for 100% of the share capital until the month before closing. When the sale closed on March 9, 2005 only the voting shares were purchased.

39. In March 2005 the Radianz Board, now fully controlled by Reuters, amended the Plan ("the Amended Plan"). The Amended Plan added Section 5.7A.1. Section 5.7A.1 is a cash cancellation provision. The cash cancellation provision provided:

> Notwithstanding Rule 5.2.1, the Board may, in its absolute discretion, cancel all or any subsisting options (both Vested and unvested) in consideration for a cash payment to the option holders. The amount of the cash payment will be calculated on the basis of the difference between the Exercise Price of the Option being cancelled and the per share price paid by the person acquiring 100% control of the Company, provided that the per share price paid by the person acquiring 100% control of the company exceed the exercise price of the option being cancelled, however, if the exercise price exceeds the per share price, there will nevertheless be a cash payment of a nominal amount.

The amended Plan is attached hereto as Exhibit B.

40. The Plan was amended not only to include a cash cancellation provision, but to change the definition of 100% control to exclude C shares so that the cash cancellation provision could be triggered. The Options were then cancelled.

41. Under the terms of the March 9, 2005 Share Purchase Agreement, BT funded the cash cancellation provision and received a partial indemnity from Reuters in case the action did not work and they were sued. On information and belief, BT realized the main risk of the transaction was the option holders' dispute of the transaction. BT tried to mitigate their risk by funding the cash cancellation and was aware that if the Amended Plan is void, they would either have to buyout the option holders or have minority shareholders. BT contemplated buying the option holders out if that occurred.

42. Without the addition of the cash cancellation provision, the original offer by BT for 100% of Radianz share capital would have triggered the employees right to exercise options or receive options in BT. With the cash cancellation provision, the offer could be changed to exclude C shares and eliminate the options held by Radianz employees.

43. The Radianz Board, which is controlled by Reuters, determined that BT's stated purchase price for Radianz of $175 million put all of the options out of the money. The board then cancelled the options and authorized a $0.10/share cash payment to option holders before the BT sale was completed. BT funded the $0.10 cent cash payment to cancel the class C shares.

44. The Radianz Board knew that $175 million bid was not reasonable and ignored the full purchase price of Radianz for the benefit of Reuters and the detriment of option holders. This was the same board that awarded options to employees months earlier based on the $429 million Houlihan Lokey valuation, and that was offered, by Houlihan Lokey, a proposed valuation for the sale which included cost savings and other consideration paid for Radianz that

would have correctly placed the value of Radianz to over $2.00 per share. The Radianz Board not only ignored the objections of Gilstrap, who requested an independent valuation of Radianz at the time of the sale, but ignored the objections of Howard Edelstein, Radianz President, CEO and board member at the time who requested an independent valuation. Radianz now claims that the amendment did not harm the option holders because based on the $175 million purchase price of Radianz by BT, all the options were worthless.

45.     In late March, 2005, Plaintiffs received a letter signed by two Reuters employees who also serve on Radianz's Board. This letter misleadingly explained that all the options were worthless, that the options could not be exercised, and that option holders would be paid $0.10/share for their options. In mid April 2005, Radianz New York management sent a similar letter reiterating the same misleading statements. In the summer of 2005, Radianz Americas paid or attempted to pay Plaintiffs the $0.10/share.

46.     Reuters is still dependent on Radianz today. Radianz is still providing virtually all of Reuters legacy and IP extranet services nearly two years after BT won the auction. No customer migration to BT networks has taken place and Reuters is still adding more customers to the original Radianz network. Reuters is now more tied to the Radianz network than it was before the sale. Only the ownership and the pricing of Radianz has changed. The use of Radianz assets, people, and intellectual processes to service Reuters continue and is expected to continue for the foreseeable future. The value that was improperly shifted into the Service Agreement for this inextricably linked relationship with Reuters is properly part of the purchase price of Radianz's assets.

## CLAIMS FOR RELIEF

## COUNT I – BREACH OF CONTRACT-THE PLAN

47. Gilstrap, Dillon and Madigan incorporate all of the above allegations.

48. Radianz Ltd. and/or Radianz Americas, entered into a binding agreement with Plaintiffs in New York when Radianz Ltd. and/or Radianz Americas made an offer of stock options to Plaintiffs and Plaintiffs accepted and received stock options in Radianz Ltd. after the creation of the Plan and pursuant to the terms of the Plan. The offer and acceptance of options occurred in New York. Radianz Ltd. awarded the options to employees of Radianz Americas at the direction and control and as the agent of Radianz Americas and Radianz Americas is liable for the acts of its agent. All conditions precedent to this agreement have been performed or have occurred.

49. Radianz Ltd., on behalf of itself and as agent for Radianz Americas, breached the agreement by amending the Plan to insert a cash cancellation provision and then by using the cash cancellation provision to cancel the options, and deny Plaintiffs the right to exercise their options or obtain new options. This amendment violated section 8.3.1 of the Plan prohibiting amendments to the material detriment of the option holders.

50. As a direct and proximate result of the breach by Radianz Ltd. and/or Radianz Americas, Plaintiffs have suffered damages in excess of this Court's jurisdictional limits. Plaintiffs have retained counsel to pursue these claims and are entitled to recover reasonable and necessary attorneys' fees.

## COUNT II – BREACH OF CONTRACT-THE AMENDED PLAN

51. Gilstrap, Dillon and Madigan incorporate all of the above allegations.

52. In the alternative, Radianz Ltd., on behalf of itself and as agent for Radianz Americas, entered into a binding agreement with Plaintiffs when the Plan was amended on March 17, 2005.

53. Radianz Ltd., on behalf of itself and as agent for Radianz Americas, and/or Radianz Americas itself, breached the amended plan provision at §5.7.A.1 when they determined that the $175 million stated purchase price constituted all the consideration being paid for Radianz for purposes of determining whether the per share price paid for Radianz exceeded the exercise price of the options issued under the Plan and paid or attempted to pay Plaintiffs a nominal payment of $0.10/share instead of the payment owed had the per share price paid for Radianz included all consideration received for Radianz.

54. As a direct and proximate result of Radianz's breach of the amended plan, Plaintiffs have suffered damages in excess of this Court's jurisdictional limits.

## COUNT III – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING-THE PLAN

55. Plaintiffs incorporate all of the above allegations.

56. Radianz Ltd. and/or Radianz Americas, entered into a binding agreement with Plaintiffs in New York when they received stock options in Radianz Ltd. after the creation of the Plan and pursuant to the terms of the Plan. The offer and acceptance of options occurred in New York All conditions precedent to this agreement have been performed or have occurred.

57. Plaintiffs maintained an expectation under the express terms of their agreement with Radianz Ltd. and/or Radianz Americas and the Plan that if Radianz was acquired by another

company, they would be able to either exercise their options and receive shares of Radianz or otherwise receive new options in the company that acquired Radianz.

58. Radianz alone possessed the power to amend or alter the Plan.

59. Radianz Ltd., on behalf of itself and as agent for Radianz Americas, breached its duty of good faith and fair dealing when it modified the Plan to prevent Plaintiffs from exercising their options and also refused to grant Plaintiffs options in BT, the company acquiring Radianz.

60. As a direct and proximate result of Radianz's breach, Plaintiffs have suffered damages in excess of this Court's jurisdictional limits.

### COUNT IV– BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING-AMENDED PLAN

61. Plaintiffs incorporate all of the above allegations.

62. In the alternative, Radianz Ltd., on behalf of itself and as agent for Radianz Americas, and/or Radianz Americas itself, entered into a binding agreement with Plaintiffs when Radianz amended the Plan on March 17, 2005.

63. Plaintiffs maintained an expectation under the terms of the amended plan and the cash cancellation provisions at §5.7.A.1 that if Radianz was acquired by another company the calculation of the per share price paid by the acquiring company would include all elements of the consideration paid for Radianz and not just the stated purchase price. Radianz alone possessed the power to determine the per share price paid for Radianz in accordance with § 5.7.A.1.

64. Radianz Ltd., on behalf of itself and as agent for Radianz Americas, and/or Radianz Americas itself, breached its duty of good faith and fair dealing to Plaintiffs when it considered only the stated purchase price in determining the per share price paid, ignored the hundreds of millions of dollars of additional consideration paid through other contractual mechanisms such as the Service Agreement, and through Radianz Americas only paid Plaintiffs $.10 per option. In so doing, Radianz deprived Plaintiffs of their expected benefit under the Plan as amended on March 17, 2005.

65. As a direct and proximate result of Radianz's breach of its duty of good faith and fair dealing, Plaintiffs have suffered damages in excess of this Court's jurisdictional limits.

## JURY DEMAND

66. Gilstrap, Dillon and Madigan demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A. That the Court enter Judgment providing the following relief to Plaintiffs:

  (i) Joint and several liability against defendants, requiring them to make Plaintiffs whole for the losses (actual damage) incurred as a result of their actions;

  (ii) Reasonable attorneys' fees and costs incurred;

  (iii) Interest on all Judgment amounts as provided by law; and

  (iv) Such other legal or equitable relief as may be just and proper.

Dated: December 6, 2006

Respectfully submitted,

*Stephen D. Susman*
Stephen D. Susman - 3041712
Attorney-In-Charge

```
```
SUSMAN GODFREY L.L.P.
590 Madison Avenue, 8th Floor
New York, NY 10022-8521
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

OF COUNSEL:
Stuart V. Kusin
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Jason P. Fulton
SUSMAN GODFREY L.L.P.
901 Main Street, Suite 5100
Dallas, Texas 75202-3775
Telephone: (214) 754-1900
Facsimile: (214) 754-1933